May it please the Court, Gia Kim, appearing on behalf of Petitioner-Appellant Jason Pappas. I'd like to reserve two minutes for rebuttal. This case involves a certified claim of prosecutorial misconduct and an uncertified claim of juror misconduct. And this Court should review each of those claims de novo because the California Court of Appeals resolution of each of those claims was based on an unreasonable determination of the facts under 28 U.S.C. 2254 D-2. And on de novo review, this Court should grant relief on the prosecutorial misconduct claim and an evidentiary hearing on the juror misconduct slash bias claim, beginning with the issue of prosecutorial misconduct. The California Court of Appeals' denial of this claim rested in large part on its conclusion that the evidence of Mr. Pappas' mental state implied malice for second-degree murder was overwhelming. That conclusion, in turn, rested primarily on an undisputed and clear-cut mistake of historical fact concerning the nature and circumstances of Mr. Pappas' prior conviction. If you look at the California Court of Appeals' decision at ER 3, 6, and 12, you can see that they conflated two prior convictions. Right. The State doesn't even dispute that. No, Your Honor. But you alluded to the term overwhelming evidence. I mean, that wasn't the only fact that the State Court of Appeals relied on. The Watson admonishment. That was the primary fact. They went through the facts, didn't they? And they say there was, they make reference to the facts. They say when they do go through the facts, however, when ruling on that claim, they mention two things. They say the evidence was overwhelming for this reason of the prior conviction, which mirrored precisely in the erroneous construction, which mirrored the facts of this case. And the California appellate courts have said that a prior injury accident when driving under the influence is a very significant factor in the implied malice inquiry. They also mentioned that the court gave, you know, sustained objections to the prosecutor's comments. However, it need not be under this court's and the Supreme Court's case law the only fact it relied on. For instance, in Wiggins v. Smith, which was a similar case of D2 error. In that case, it was a capital case, and the state courts had erred in what certain social service records indicated. They thought that they had included evidence of the petitioner's sexual abuse, whereas, in fact, there was no such evidence in there. That wasn't the only fact they relied on, but because it was. Why was that fact so critical? The fact was so critical because the jury was specifically instructed on how it could use the prior convictions or arrests for DUI, and for DUI alone, it said. So it said, you are permitted to look at the prior arrest, that was a 2004 arrest, and the prior conviction, 2007, to determine whether he had the required mental state. And the California Supreme Court has said that that is a high standard. They approved of this charging practice, but they say, you know, this is a practical matter. It may be hard to meet. And the jury was instructed that they could use those to determine whether he had learned from those experiences that driving under the influence. Well, the jury knew that the 2007 was, what, a year before this particular incident? A little bit more than a year? Yes. Is that correct? Yes, Your Honor. And that he had been admonished in that case with the Watson advisement. The jury heard that, yes. They knew that. That came in through stipulation and exhibit. The 2004 arrest and the previous conviction. So how does that play into the harmless error analysis? Or the Breck under Breck? Well, under Ilse Wiedemaker, we look through to the last reasoned decision of the state courts. And here, that decision was the decision of the California Court of Appeal. And they did give a reasoned decision on this claim of prosecutorial misconduct. And I think the Supreme Court's jurisprudence, while saying a state court need not always give reasons to receive deference under Richter and so forth, when it does give reasons, we inspect or the reviewing court in habeas looks at the reasons that it actually gave. So if those reasons were tainted by a factual mistake or a contrary to it. I guess my question was, how does that affect the Brecht analysis? I don't think that the fact that the jury heard. Or the fact that the state court of appeal conflated the two incidents. Well, this court in Deck v. Jenkins addressed how Brecht works in the context of a prosecutorial misconduct claim. And since the standard under Darden is so infected the trial with unfairness so as to deprive the defendant of due process. This court in Deck said that Brecht is subsumed within the prejudice part of the prosecutorial misconduct claim. So in that case, it did not separately go through Brecht. So I think as long as this court finds that the prosecutor's statement so infected the trial with unfairness, it need not go through Brecht separately. But could I, so could I, let me ask you about whether this factual error was material. We know the court of appeal made a factual error in describing the conviction. But I guess I'm not really understanding why it has to be under the law a material factual error, an important factual error, right? Yes. Otherwise, there's no relief under 2254 D2. You agree with that, right? Yes, Your Honor. Okay. So explain to me why this was an important factual error. I mean, it seems to me that the error that the court of appeal made essentially is that it assumed that Mr. Pappas received the Watson admonition 12 years prior to the accident. Whereas, in fact, he had received the Watson admonition one year prior to the accident. And beyond that, the error is just, you know, was it two convictions that he received? One for, you know, escaping the police and one for DUI? Or was it one conviction in which he did both at the same time? When you put all that together, that doesn't sound like a very important error. And if anything, it was an error that might have cut in Pappas' favor in the analysis. Your Honor, I would argue that it's important because that instruction at 783 of the ER asks, what did he learn from these prior DUI experiences? And the fact of an injury or an accident, a collision, while driving under the influence is significant to that. His defense was, I mean, the way the DA characterized it is, you know, he says he's a good drunk driver. And there is a difference if he had, there was evidence that he had driven under the influence twice before, and neither of those events involved erratic driving. But the jury still, but the jury still learned, the jury learned of his escape conviction, right? Yes, Your Honor. His conviction for fleeing officers, and learned that he had a collision in that incident, right? Yes. The jury learned that he was convicted for escaping a police officer, and when he tried to escape a police officer, he had a collision. The jury learned that he was convicted for drunk driving, and he received the warning. And then what he did was he went and he tried to escape a police officer while he was extremely drunk. So it sounds like, I mean, I guess two points. One is it seems like the strongest evidence of his state of mind was not whatever happened with his prior convictions, but the fact that he attempted to flee an officer while really drunk with a passenger in the car. Like that in itself is evidence of his mens rea, of his state of mind. But then when you look at the prior convictions, it seems like his prior convictions put him on notice, and the jury knew that he was on notice, that it's dangerous to flee the police, and it's dangerous to drive drunk, which means it is certainly dangerous to flee the police when you're extremely drunk, when you have a passenger in the car who might die. Well, Your Honor, the trial court at ER 196 to 197 said it wasn't certain it could use the felony conviction for evading as part of that Watson advisement. Certainly the prosecution could argue that he was traveling at a high rate of speed, but the instruction directs it to the DUI events specifically, and that's where I would draw the distinction and say there was no correlation in his mind between driving under the influence and his specific conduct that day when he took over the wheel, that he knew that would result in a high probability of death. Are you saying the jury couldn't assume that his prior incident of fleeing from the police put him on notice that it was dangerous to flee the police? I don't see that that was covered in the instructions, Your Honor. Okay. Unless she's over. Yeah, I know. Can I ask her about the second claim you have, which is the germist conduct? Yes, Your Honor. So that, we've argued, implicates a different form of D2 error, as this Court set out in Taylor v. Maddox, specifically not the ultimate conclusion at this point, but the fact-finding process at which that conclusion was arrived at. What more could the judge have done? That is, the trial judge. Yes, Your Honor. Well, for a start, he could have granted the defense's request to interview the two female jurors who, one could not be contacted and one refused to come in. At ER 116, the minutes show that when the court contacted them, it asked them, are you willing to speak to counsel regarding MADD affiliation, that specific question? And we have argued that that, by privileging juror privacy, and the State hasn't argued that that would override Mr. Pappas' right to a fair trial here, that it should be remanded for a full and fair evidentiary hearing on that ground. So he should have just asked them, do you want to talk to, are you willing to talk to counsel about the trial? I'm not certain, Your Honor, but I think if the juror had refused, that he should have granted. Suppose the juror said, you know, I served my time, I attended the trial, I'm finished, I voted, and I don't want anything more to do with this, I'm done. That is what the juror seemed to say here. So what is the judge supposed to do? You know, there was an intermediary step, which it turned out that MADD was willing to respond to the subpoena to everyone's surprise. He should have just subpoenaed MADD's records for these other two. Yes, Your Honor, as a start. Did he subpoena the records or did he send, did the DA go and get information from MADD? Did MADD provide the information voluntarily? The defense issued a subpoena and MADD responded to the court, and the court reviewed those in camera for the four names of the jurors who had already denied. And he just didn't add the other two names. The other two names. So that's what you want? Does that take, so if we were to go back and we were to say, tell the district court judge to conduct a hearing, assuming we were to do that, you'd want the district court to subpoena the MADD records? I mean, Your Honor, I'm not seeing, these documents were not lodged below the jurors' affidavits and the terms of that subpoena. It's my understanding that there may be a national, I'm not sure what the records would show now historically as to membership in 2009. But as a start, we would, that would. I noticed that there was some mention in the briefing and the records and whatnot that the transcript of the voir dire itself was not fully transcribed. Your Honor, it was not. It was taken down because the court reporter's notes reflect that it was taken down. She took down the voir dire, but nobody requested that the transcript be. It was not lodged below in the district court proceedings. I do believe it is. It says not transcribed. Was it later transcribed? I do believe it is because if you look at Mr. Papa's appeal and direct review to the California Court of Appeal, it's lodged in this court at docket 8-9. The full transcript of the voir dire of every juror? It's not there. However, Mr. Papa's appellate lawyer in state court apparently conducted a review of that and, you know, has some notes on that attorney's review. Why didn't you get it and put it in the record? I was appointed to this case on appeal, and that record was not before the district court in ruling on this claim. The attorney general's office lodged particular documents relevant to this petition when it was filed in district court. Let me ask you this. Let's say that it comes back, the subpoenas are served and information comes back and these women's names don't appear on MADD records. Does that end the whole thing? Your Honor, again, it would depend on the state of MADD record keeping and whether I would say not necessarily, but if MADD has a list of I guess what I'm getting at is are you suggesting that the district court would have to order these jurors in to be examined? I'm not ruling it out, but I wouldn't say that necessarily the resolution of this claim depends upon it. Again, the first step, I think, would be checking against the MADD membership list. Okay. Thank you. Good morning, Your Honors. May it please the Court, Deputy Attorney General Christopher Beasley. On behalf of the respondent, starting with the prosecutorial misconduct claim, yeah, the Court of Appeal made a mistake in its narrative as it talked about the harmlessness of the prosecutor's conduct. However, a review of the entire opinion indicates the Court of Appeal was not unaware of the fact that there were two convictions, one from 12 years earlier when Mr. Pappas was convicted of the evading and then the later conviction a year and a half before the incident here at play here where he was convicted of driving while under the influence and received the Watson Advisal. Although the Court of Appeal in its analysis failed to identify both of those, in the opinion the Court is well aware that both of those convictions do indeed exist, and we review this in its totality. We don't just isolate one little sentence out of the Court of Appeal's opinion and conclude, oh, this amounts to some sort of an unreasonable determination of the facts. We look at the Court of Appeal's decision as a whole, and we look at that and have to decide, would reasonable jurists conclude otherwise here? Would there be room for reasonable debate here? There is no prosecutorial misconduct here. Yeah, the prosecutor made some mistakes. Every one of those mistakes were objected to, and the ones that were objectionable, the trial court did indeed sustain the objections and there was admonishment given to the juries and there were also instructions given to the jury that... But shouldn't the trial court, I'm not sure your best strategy is to lead with, you know, the idea that the prosecutor wasn't that bad and the trial judge did a good job of fixing the problems because I don't think there's any reasonable argument that that happened. I mean, the trial judge should have instructed the jury to disregard these repeated inappropriate statements by the prosecutor, and the trial judge did not do that. I mean, it seemed to me that the trial judge was taking a pretty laissez-faire attitude to the closing argument. Towards the end of the prosecutor's argument, the trial judge did instruct and did admonish the jury, look, you are bound to the evidence that you have before you, you are bound to the record that's before you, you are bound by the law that I give you, not by the prosecutor's arguments. But was that enough to overcome the inflammatory nature of the prosecutor's statements? Yes, because the jury is presumed to follow the instructions of the trial court, and that presumption has not been rebutted here. Plus, we have to look at, if you look at the prosecutor, yeah, the prosecutor made mistakes. I'm not going to dispute that. No, he didn't make mistakes. He was purposefully and intentionally talking about passing the drunk driving laws, and I mean, this is a very big part of his closing argument. Abominable, I think, is a word to describe it. It was abominable. It was abominable what the DA did, what the deputy DA did. I agree that those statements that the DA made should not have been made. But we also have a huge chunk of the argument that was appropriate, and we do have the instructions by the trial court. And there is nothing here that rebuts the presumption that the jury would not have followed the trial court's instructions. So the court of appeal, in analyzing everything and looking at what was going on here, the court of appeal reached a reasonable conclusion that there was no harm here. It was harmless. So are you arguing that the factual error was not material, or are you arguing that under de novo review, we should conclude that the prosecutor's totally inappropriate conduct did not have a substantial and injurious effect on the jury verdict? I would say both. My main contention is that it was not a material fact that the court of appeal missed when it was doing its analysis. But even if we were to go to de novo review, under breadth, what happened here was not substantial and injurious to the defendant. As far as the jury misconduct claim, voir dire was indeed transcribed. I have no idea why it was not lodged. I don't know. Was the question about MADD membership asked in the voir dire? Yes, it was. And everyone said no? Yes, except for one juror. There was one group where that question was not presented to that particular group of jurors. But that's not clear. That's not exactly the judge. The trial judge said, well, I think there may have been one group that we didn't ask this to, ask them about this. Right. He's not, like, certain that they didn't or didn't. He says, man, there may be one group that we didn't ask that. Right. That's correct. That's correct. And I can't. And then I went looking for the voir dire transcript to see what happened. Right. And it's not in this record. Right. And I do not know why it wasn't lodged. But part of the voir dire's transcript that is in the record seems to reflect that the voir dire was transcribed by the court reporter, taken down. Yes. But not transcribed. No, no, it was transcribed. It was transcribed. It was transcribed. Okay. It was transcribed. And appellate counsel on the direct appeal had those records. Our office had those records. And that's why I'm surprised that it wasn't lodged with this court or with the district court when the answer was filed. Because usually that would have been lodged with the district court. Well, does that transcript show that every juror, does it show, in fact, that some jurors were not asked? Were you a member of MADD? I don't recall. So I actually handled the direct appeal. And what I do recall from the direct appeal and the issues that were raised was that the transcripts do reflect that one juror was not asked. That was juror number 12. But juror number 12 was actually one of the four jurors that talked to the counsel and indicated that she was not a member of MADD and she was not on the MADD lists when those lists were subpoenaed. So how do we know that or verify it or figure that out for ourselves? I mean, I'm not disputing that you're not. I mean, I'm not suggesting that you're not telling us correctly, but you're doing this from memory. Right. Part of the record that was before the district court was the appellant's opening brief. And in the appellant's opening brief, there's actually reference to what I'm saying and to the fact that it was juror number 12 that was in that group. And so it's in that part. When you say opening brief, you mean the opening brief in the state court of appeal? That's correct, the appellant's opening brief on the direct appeal. There's reference to it in the opening brief. There's also reference to it in the respondent's brief, the brief that I filed on direct appeal with citations to the voir dire transcript. As far as what happened here, we had an evidentiary hearing. We had one juror, juror number one, come forward and suggest that there was a member of MADD on the jury. We know a lot about this juror because she also talked to the press. She talked about how she didn't like this verdict, how she wished that a different conviction was available for manslaughter. We know that as she described what happened during polling, that that was not reflected in the record at all. There was no, I guess, guilty statement made by her when the jury was polled. She was the first to be polled, and she said when asked, is this your verdict, she said, yes. So we know that this is a juror who she's emotionally distressed by this verdict. And she remembers things differently from what the reality of the facts actually are. Oh, no, that's not in the record. Let me, okay, are you, want some water? No, I'm okay. Okay. Let's see where I was going. So that's not in the record. But what is in the record is, I guess, that even the court was concerned with the charge that was made and wanted the, I hope I have the right case, wanted the district attorney's office to lower the charge and not have it be this high a degree of murder. And the district attorney went back to his office and discussed it and then wouldn't lessen the charge. Like there was some sentiment, even by the trial court. That may be true, but that's an executive decision. That's a decision of the executive. Right. I'm just suggesting that maybe she's not just so emotionally distressed that the trial court itself. The trial court itself may have expressed some misgivings, but the trial court itself also expressed, and it is in the record, that she was emotionally distraught by this verdict. That she was, I don't remember the exact words, but the trial court made an observation as to what she is sensing and feeling about this verdict. So we have her testimony, and then we have four declarations from jurors who all agree no one on that jury made a statement indicating that they were a member of MADD. And those declarations were produced by whom? Those were produced by the counsel. They talked to the attorneys. By defense counsel? I think so. Okay. So defense counsel produced declarations from the four other jurors. Right. So what happened was that the trial court let, wrote, they wrote letters to the six other female jurors because juror number one had said it was a woman that had said, an elderly woman on the jury that had said, we at MADD. So they wrote to the six other female jurors. Four responded and said, yeah, it would be okay to be contacted by counsel. And so then the attorneys were able to contact these four jurors. And then the declarations were produced from that contact, and they were submitted to the trial court. So the trial court then had these declarations with four jurors saying, no, that kind of statement was never made. Nobody on this jury was a member of MADD. Well, that's not exactly what the declaration said. But did the trial court actually make a factual finding that her statement was, juror number one's assertion was incorrect? The trial court made a finding that nobody on the jury was a member of MADD based on the evidence that was before it. The trial court was careful not to call her a liar. The trial court said, look, I'm not going to say that she's a liar. I think she's an honorable person. She's remembering things the way that she remembers them, right? And that was a matter of respect for her and for her personal dignity. But the trial court did make a factual finding that there was no member of MADD based on the evidence that was before it. Where's that finding? I don't recall that specific. I don't recall him saying specifically. I find that no member of the jury was a member of MADD. I do not. Because he was somewhat cautious that he didn't know whether or not every juror had been asked. He couldn't remember. Right. Yeah, he was. But the court somewhere in my brief, and I apologize. I do not have the citation for it. But the court does make that finding, finding that she had second thoughts. No, you're correct. I mean, in my recollection. Well, look at ER 1003. I think that's where they're discussing it. But I think I agree with Judge Paez. I don't think he clearly stated that. It seems like he's saying we just don't know. Yeah. But what he had learned, and he was very sensitive with respect to the other two jurors about not interfering with their rights of privacy, that he wasn't going to do anything further. Right. The court was concerned about that. The court also, and this was quoted by the Court of Appeal, the court said, I concluded there was no misconduct because there was not a MADD member on the jury. Where is it? But where is that? That's the Court of Appeal summarizing. Court of Appeal quoting the trial court. Was that another factual error by the Court of Appeal? So where is that in our record? And I apologize. I do not have the ER site for that. But it is in the record that the trial court did make those statements. Let me ask you this. I just kind of, I found this interesting. To what extent, you know, all this privacy for state court jurors now. Everybody is very careful. Everybody gets a number. Right. And I respect that. I think that's probably a good thing. To what extent does the defendant's rights, don't they collide? I mean, like in an instance like this. It is. There is a compelling interest to maintain the privacy of jurors. Has the California Supreme Court addressed this yet? The California Supreme Court? Yes. In counsel versus superior court, the California Supreme Court talked about this  interest because of what would happen is jurors that know that they can then later after trial be interrogated about what happened. Well, we used to do that all the time in state court. I mean, we didn't identify jurors by numbers. Everybody knew who everybody was. And over time, there has become an interest as losing litigants tend to want to talk to jurors and want to interrogate them and find out what went on. There is a danger for potential harassment. And then there's the danger for potential jurors not wanting to. I remember you used to tell them in state court, you used to tell them, you know, I tell the jurors, you don't have to talk to these people. And I tell the lawyers, if they don't want to talk to you, you're not to talk with them. And if you do, you can be held in contempt. And that's correct. And that's to maintain that privacy. Now, the federal courts have recognized that privacy interest as well. And it takes a compelling showing of misconduct to penetrate that veil of privacy. Wouldn't it have been reasonable here, he went to the trouble of having the MADD record subpoenaed for the four. Why didn't he just add them all? There are many things that the trial court could have done. That would have been no interference with any privacy rights? There are many things that the trial court could have done. But the question is, what was the trial court required to do? Let me ask you a different question. If there had been a juror who belonged to MADD who had been in the group who lied about it in the void year, what's the next step in the analysis? Well, that would amount to McDonough error. And in those situations, the analysis is what kind of effect did that have. And usually it's going to ultimately result in a new trial. Well, I'd be pretty serious. Yeah, I mean, it is because you're entitled to an impartial arbiter of the facts. So given that, it just seems so odd that no one's gotten to the bottom of whether or not, in fact, there was a MADD member on the jury. But you do have a finding by a trial judge that got to the bottom of it. No, he didn't. He did not do all he could do to get to the bottom of it. But that's not what's required. Our Supreme Court has never said that a trial court is supposed to haul in every single juror to figure it out. It gives me, like, some hesitation and some pause in my analysis of this case. Like, I want to go find out the answer to this. And we have an answer. We have a juror who is not believable. We don't defer to a finding that's clearly incorrect, even under the Supreme Court. If it's really incorrect and unreasonable, we don't defer to it. But this is not one of those situations where we have an unreasonable determination of fact. Nor do we have an unreasonable process. The process could be unreasonable. Nor do we have an unreasonable process. We have a reasonable process in which the trial judge found out from juror number one her view of what happened, and from jurors' numbers, whatever their numbers were, the four other jurors, what happened, and was able to conclude that there was not a MADD member on this jury. That process. But what he said, that's what I don't understand is, I mean, it sounds like maybe elsewhere he reached that conclusion. But he said, you know, at ER 1003, we just don't know. It's too nebulous. I don't know at this point what was said or by whom, really. We've exhausted any way to try to find out. What he's talking about at that point is not whether someone is a member of MADD. He's talking at that point about what statements about MADD may have been made. MADD was in the record. It was evidence. He says there's, I don't think, that's not how I read it. I mean, he says there's no evidence that a member of the jury was a member of MADD. We just don't know. It's too nebulous. And I think that if you read in context what he's talking about, we have two kinds of things going on. Is a jury member a member of MADD? And what are their statements made about MADD? Yes, there most likely were statements made about MADD. There was evidence in this record that a police officer had received commendations by MADD. We had a prosecutor that even talked about. Everybody knows that this kind of. Hey, hey, you don't have to raise your voice. Everybody knows that this kind of crime is dangerous because of the public campaign of MADD and their efforts. So this jury is going to be able to talk about MADD and say. Okay, I get that. I see that. That's a plausible reading of it. And so when you look at that, was this process defective? No. Does the trial court have to overturn every single stone? No. Does the trial court have to take reasonable steps to figure out was there someone on this jury that was a member of MADD? The trial court here did. Not a member was. Not one of them was a member of MADD. All right. Thank you, counsel. You're well over. Eight minutes over. I know we asked you a lot of questions. Thank you, Your Honor. Thank you. I'll give you your two minutes. Thank you, Your Honor. Starting with the MADD member issue first. Just to clarify one factual point, it was the DA who obtained the declarations ultimately, though both counsel did speak to the jurors informally, it appears, before that. The ultimate declarations at ER 982 were submitted and obtained by the prosecution. And was there any dispute from defense? So you said that defense counsel and the DA's office spoke to the jurors together? I think separately, Your Honor. Was there any dispute from the defense counsel about the accuracy of the statements in the declarations or anything like, hey, that juror number three said something different to me? Anything like that? There was not at that time at ER 982. However, before the declarations were obtained, defense counsel had said, I've talked to them and to remember at some point there was discussion of two people who mentioned a comment about MADD and one woman who mentioned that they heard that someone was on MADD and remained on the jury. So that did not make it into the declarations filed by the DA. However, they weren't challenged as inaccurate as to the points that the declarations did cover. What was the trial court's finding on whether or not there was a MADD member on the jury? He found that no misconduct had occurred because on this record he couldn't find that there was a MADD member on this jury. And I think importantly to the sort of detour we're raising here, that he couldn't think of anything else he could do. And that's the unreasonable portion, we would argue, of this process when the once they learned that MADD was responsive to the subpoena, which the trial court did not expect. He said that you will be told to pound sand and go away. That was another step. He suggested that multiple times and the trial court just said, I can't, that juror privacy principles prevented him from doing that. Even in a case where Mr. Pappas had raised at least a colorable and I would say substantial claim of juror misconduct. And so the remedy would then be to grant the habeas petition on 2254D2 on the ground that it was the fact-finding process with respect to juror misconduct was defective, and then send it down, say that there are needs to the state court is required to have? The district court, Your Honor. The district court would have to have an evidentiary hearing on this? Yes, Your Honor. Question. And the overcoming D2 is important because there cannot be an evidentiary hearing in federal court until D1 or D2 is satisfied. And then what would happen at the, Judge Pai has asked this question earlier I realized, but I want to hear further about what would happen at the evidentiary hearing? Like which witnesses would be called? What subpoenas would be issued? What would the fact-finding process look like now several years later? Yes, Your Honor. I think at first, the first step would clearly to be to supplement the record with the voir dire transcript and the affidavits that are under seal that weren't lodged below. Second. So it wouldn't be granting of the habeas petition, it would just be a remand for an evidentiary hearing? A reversal of the denial. Okay. And sending it back for further proceedings for a ruling based on a more full and fair record. We would first have to say, as you just mentioned a moment ago, that the fact-finding process was unreasonable. Yes, Your Honor. And then we'd send it back down for an evidentiary hearing. Yes. And so they put the transcript of voir dire in. What else would happen at that evidentiary hearing? Then I think before that there would be discovery, which the district court could stage. In Milk v. Ryan v. Brady case, this court ordered the state to produce the officer's personnel file that was But what I'm asking about in this evidentiary hearing, let's say you're continuing to represent Mr. Pappas in that proceeding, what would you do? What witnesses would you put on? Who would you call? What discovery would you do? What would happen at that hearing? We would want discovery of the juror's identifying information, probably as a first step, to subpoena MADD for those records if such records historically are available. If not, I think there is another way to prove that there was a MADD member on the jury if other jurors heard it. Now, when Juror 1 spoke about it, she said that it was said mostly to this group of three, maybe, jurors who were aside and discussing some issues. So it's not necessarily the case that everyone would have heard it. And then, you know, it depends on whether these other two jurors are available. We would probably want to re-interview Juror 1. She seemed to have a very firm idea of who the juror was who made this comment, and it probably would not be that difficult to narrow it down. I think she, you know, it was a woman. I think she mentioned it was an elderly woman. And once we have the identifying information, it would be, I think, much, and matched against the voir dire, it would be fairly easy to narrow the issues as to who might have said this and whether they are one of the people who already gave a declaration or not and whether they're available to be interviewed today. All right. Thank you, Counsel. Thank you. Pappas v. Miller will be submitted.
judges: Wardlaw, Paez, Chhabria